UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

LEROY D. SIMPSON, III                           CIVIL ACTION

v.                                              NO. 12-2038

SEWERAGE & WATER BOARD                          SECTION "F"
OF NEW ORLEANS

ORDER AND REASONS

Before the Court is the Sewerage & Water Board of New Orleans'
motion for summary judgment.  For the reasons that follow, the
motion is GRANTED.

**Background**

This employment discrimination lawsuit arises out of a former
Sewerage & Water Board employee's allegations of same-sex sexual
harassment and retaliation.

Leroy D. Simpson, III was hired as a Management Development
Support Specialist I, a position established by the Civil Service
Commission, at the Sewerage & Water Board of New Orleans on January
27, 2009. Mr. Simpson was tasked with directing administrative
activities, which included a broad array of duties such as budget
management, personnel administration, liaison duties with other
agencies, and other related work.

In November 2009, John Wilson became the Board's Director of

1

Support Services, and Simpson's supervisor.  Wilson reported directly to Robert Miller, the Board's Deputy Director; Miller in turn reported directly to Marcia St. Martin, the Board's Executive Director.  Three months after working for Wilson, Simpson became aware that Wilson is a homosexual; Simpson invited Wilson to his wedding, told him to bring the "missus", to which Wilson responded that he was "with a guy."

With Wilson's support, Simpson was named Employee of the Year in December 2010.

On January 31, 2011 Wilson issued to Simpson an inter-office memorandum, the subject of which, Mr. Wilson wrote, "is out of consideration of your positive accomplishments and good attributes while documenting your pattern of over stepping the lines of authority of Support Services Division Superintendents as well as my authority as Director of this Department."  Throughout the five and one half page memo, Wilson notes incidents of Simpson's "arrogant showmanship" and acting without authority; Wilson notes the several counseling sessions he has had with Simpson, and warns that "[m]ore severe disciplinary action may be considered if this behavior continues that may possibly include demotion or suspension."  Wilson concludes:

> You have told me after this latest clump of incidents
> that you would be satisfied to focus on Fixed Assets
> to work on the internship project.  I as well as the
> individuals copied on this document are looking forward
> to your continued professional development.  There is a
> lot of potential through time and experience for you to

move forward in this organization.

A few days later on February 4, 2011 Simpson responded to Wilson's Memorandum of Authority Adjustment by issuing his own seven and one half page inter-office memorandum to Wilson. Simpson writes:

> The subject for this memorandum is out of consideration and critical concern for your debatable management practices, documentation of your lack of tact and sagacity of decision making and direction towards your employees and myself in particular, and your hyperbole and calumniation of events that you outlined in your memorandum....

During the course of Simpson's "rebut[tal]" memorandum, Simpson criticizes Wilson's management style, states "you are not my parent", and -- in the context of describing Wilson as critical of other managers and his poor management skills -- Simpson expresses his "desire to distance myself away from you". For the first time, at the end of page 5 of his memorandum, Simpson writes about Wilson's alleged sexual harassment[1]:

> I also do not appreciate you sharing your sexual exploits with me in everyday conversations both at me and around me. I do not care what you did in your past but tolerated your conversations as you mentioned that how you were "popular" with your lovers all over the world, how you and your partner relaxed one night when "one

---

[1] Although he did not report them at the time, Simpson says that Wilson's sexual gestures and remarks started sometime in June 2010, shortly after Simpson's wedding; he also suggests that he finally told Wilson to stop talking about his sexual exploits a few days before Wilson issued his Memorandum of Authority Adjustment.

3

thing led to another", how women do not turn you on "for specific reasons", or the types of escapades you had in college, and most contemptible was your repeated identified interest and inquiry in my married life pertaining to my wife "taking care of me"[.]

I was really insulted and disturbed about that content because that type of conversation is beyond encroachment of professional boundaries. You would think a man of your position and the so-called "character" you portray would contrast that type of socialization but that is far from reality in this case. I also would like to point out your inappropriateness with me on a social occasion. When we took a picture for the Support Services Christmas Party in 2010, you proceeded to slide your hand on my lower back almost to my posterior, but I moved to demonstrate my discomfort while not wanting to create a scene at the Christmas party as the employees were enjoying themselves. You then lightly placed your hand on my back and shoulder after you received the signal that I was uncomfortable in your inappropriate touching which you should be [aware] of as "out of bounds" towards another male who is subordinate to you. This is another reason of why I no longer trust you around me...I am concerned that you may overstep your boundaries even further.

Switching back to the subject of Wilson's memorandum, Simpson next

writes how he will address Wilson's proposed "corrective actions".

Finally, Simpson concludes his memo by stating:

I do not have to "appear to have a high level of intelligency" as my credentials advertise confirmation of abound erudite proportions. With sincere regret, I cannot say this for you though and you seem to want to "control me" just because I do possess more education which leads to my admirable exercising of prudence and the ability to manage better and more efficiently than you have which was confirmed by your own admission and compliments of others.... This response is not to demonstrate a vindictively laden position, as that is not up and becoming of an individual that was privileged to study and debate among scholars and leaders, but I could not allow you to outright decimate my character without refute. I conclude my response to confirm that age does not necessarily bring wisdom and you have proven that

superlatively.

I implore you to seek contrition and profound contemplation of your actions.

Three days after submitting his rebuttal memorandum, Simpson filed three formal internal grievances against Wilson for two violations of the Board's harassment policy and one for defamation.   In the "relief sought" portion of the grievance forms, Simpson requested a transfer from supervision, or monitored supervision, and that Wilson be removed from his position as director; he also requested re-assignment, as well as a written apology from Wilson in which Wilson refuted all allegations in his memo.   Several days later, Wilson issued a new memorandum in which he withdrew his critical January 31 memorandum, and the January 31 memorandum was removed from Simpson's file.

In response to Simpson's request that he be removed from Wilson's supervision, Robert Miller obliged, re-assigning Simpson to work in the finance department; it is undisputed that this transfer occurred seven days after Simpson's initial complaint. After Simpson was transferred to the finance department, he was not subject to any alleged harassment by Wilson.   Wilson did not participate in Miller's decision to transfer Simpson to a different department; Miller's rationale for moving Simpson to finance was that "it would help Simpson in his understanding of fixed assets

from an accounting perspective."[2]   Simpson's transfer to the finance department (and moves within the finance department) did not result in any change in Simpson's pay or benefits.

In response to Simpson's grievances, the Board's EEO/Grievance Officer, Bobby Nathan, conducted an investigation beginning in February 2011.  With respect to whether Simpson's harassment allegations were substantiated by the investigation, Mr. Nathan determined that it was one man's word against another's; Mr. Nathan's report suggested that perhaps Simpson's sexual harassment

_____

[2]The Board submits the declaration of Robert Miller, in which he states that:

> Prior to receiving Simpson's February 4, 2011 memorandum, I had spoken with him on a number of occasions about his work in the area of fixed assets.  One of Simpson's job responsibilities was to create a basic inventory of the Board's fixed assets. He made very little headway on this project and, it was my impression, appeared more interested in working on other matters.  [Simpson] correctly notes [in] his deposition that I advised him that I would not sign off on a promotion for him because of his failure to perform his responsibilities regarding fixed assets....

> As I explained in my February 18, 2011 memo to Williams..., Simpson's work product made it "clear to me that he did not understand fixed assets and record keeping".  I concluded that he would benefit by entering data on the financial system so he would better understand how the Board's financial system worked.  This in turn, would assist him in performing his work on fixed assets.  All of his subsequent assignments in the finance department were geared to improve his understanding of the Board's financial system.

allegations stemmed at least in part from Wilson's memorandum of authority adjustment.  Nevertheless, Mr. Nathan recommended in May 2011 that the decision made in February by Miller, to transfer Simpson to the finance department, should stand.  In April 2011 Wilson evaluated Simpson's performance as "exceeds requirements" for the previous year.  Miller reviewed Wilson's evaluation of Simpson's performance.  (Simpson was not pleased that Wilson was permitted to evaluate him).

On January 20, 2012, referencing subject line "Change in Supervisor", Simpson's then-supervisor Ethel Williams emailed Simpson that, effective January 23, he would report to Janet Cage and that Simpson's "duties will be FEMA related and other duties [as] deemed necessary by your supervisor"; Miller and others were copied on the email.  Simpson replied to Ms. Williams (and the others copied on the email) by emailing her a list of 9 questions about his new "temporary working environment until my grievance is resolved", reminding her that his classification is a Management Development Specialist I, and noting that his duties must be within the scope of his classification.  Miller responded to Simpson by email:

> I have reviewed the work assignment described in the email below from Ethel Williams and found that it is consistent with the Management Development Specialist I job duties.  No further response from Ethel Williams is required....
>
> If you have specific questions about the tasks that Janet Cage assigns to you on Monday, please ask her then.  I do

not expect her to submit written responses to your
questions, so please be prepared to take notes.

You have not been required to work out of your
classification at any point in the past year. Any
refusal on your part to perform duties assigned to you by
Ethel Williams or Janet Cage, for as long as they are
your assigned manager and supervisor, will be considered
as insubordination.

Simpson changed the subject line of the email to "Final Warning"

and responded to Miller:

First of all, I asked Mr. Robert L. Nathan, EEOC
Officer...to investigate as well as submitted a letter to
your supervisor, Marcia Armand St. Martin, Executive
Director of the Sewerage and Water Board about your feral
behavior that you aggressively displayed during your last
interaction with me when I presented you with my
grievance entitled, "Racial Discrimination, Policy
Memorandum #87" and asked him that you are to cease and
desist all verbal and physical contact with me. Since
you have violated my request yet again, I have to
consider this as an "open threat" and "reprisal" and now
have no other alternative then to get legal
representation and, to further protect myself, get law
enforcement involved. This will be my final warning to
you, so please take every precaution and modification to
once again cease and desist further contact with me.
This will be my absolute last time advising you of these
actions so do not violate my safety again.

Secondly, this is another example of how your decision
making has subjected me to adverse impact and mental and
physical harm to my constitution. Because I submitted
the email and copied you on it was to openly request that
my job duties...be placed in writing so that I may
present it to civil service authorities to ensure that
their rules are followed. I reserve the right to work in
a healthy and safe work environment and you are in
violation of that right.

Also, this correspondence also is in violation fo EEOC
enforced law Title VII discrimination as you are
aggressively facilitating and rendering undue hardship to
me because I filed a complaint against you and
[Wilson]....

Miller advised Ms. St. Martin that he felt threatened by Simpson's email and that he did not feel safe working with Simpson.   In response, Ms. St. Martin issued a formal reprimand to Simpson for his "highly unprofessional, insubordinate, and threatening" reaction to Miller, and assigned Simpson to work in the department of intergovernmental relations.[3]   Not only would this new assignment eliminate the need for Simpson to communicate with Miller, St. Martin believed that it was a good fit for Simpson's educational background.   Simpson had no complaints about his work in the department of intergovernmental relations.   Nevertheless, on March 19, 2012 Simpson resigned from the Sewerage and Water Board.[4] Simpson resigned "around the time" he was offered a job from Accenture; he has since stated that he resigned because he did not

---

[3] The record suggests that, shortly after Miller said he felt threatened by Simpson, Simpson was escorted off SWB premises. According to Simpson, who denies that he threatened Miller, this was unwarranted; he was embarrassed and humiliated.   There is no contention that Simpson was not permitted to return to the SWB to resume his daily work; to the contrary, the record establishes that Simpson continued to work at the Board for at least two more months, until March 2012.

[4] In his letter of resignation to Marcia St. Martin, Simpson requested:

> that you expunge the "reprimand" from my personnel folder, as its contents are downright libelous, in addition to being entirely denigrating and detracting of my character.   Please acknowledge this pronouncement *ad pedem litterae*, which was concluded by cogitation and absolute austerity.

feel safe with Wilson and Miller still working at the Board.

Simpson filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued a right to sue letter on May 11, 2012.  On June 20, 2013 Simpson sued the Sewerage & Water Board of New Orleans, alleging claims arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.; in particular, Simpson asserts that he was subject to same-sex sexual harassment by a former supervisor, John Wilson, and that, because he complained of the harassment, the Board unlawfully retaliated against him, culminating in his constructive discharge. In particular, Simpson charges that from June 2010 until February 2011, he was subjected to sexual harassment and a sexually hostile work environment by his immediate supervisor, John Wilson, who talked about his sexual exploits, including how he converted men in college to homosexuality; encouraged Simpson to seek him out if his wife did not treat him right; attempted to grab Simpson's butt during a Christmas party; during one-on-one meetings, sat in a lewd position with his legs spread to display his private parts while he licked his lips.  Simpson alleges that he filed a formal grievance on February 7, 2011, at which time he requested an immediate transfer from Wilson's supervision.  Two days later, Simpson alleges, Miller tried to coerce Simpson to acknowledge that he filed the grievance out of anger but, when Simpson denied it, Simpson was told he was being moved to the finance and accounting

department temporarily while his harassment complaint was being investigated. Simpson claims that he has no experience or knowledge in finance or accounting, he was asked to perform functions for which he lacked skill, and he was moved three times into areas where he had no hope of advancement, and that he never received a formal response to his grievance. He resigned in March 2012 "to seek advancement opportunities elsewhere."

Simpson seeks (1) a permanent injunction enjoining the Board from engaging in discriminatory employment practices and retaliation; (2) an order requiring the Board to make him whole, including by paying backpay, past and future medical expenses, compensation for non-pecuniary losses such as emotional pain and suffering, inconvenience, loss of enjoyment of life, lowered self-esteem and humiliation, as well as moving expenses necessitated by Simpson seeking employment in another state; and (3) an award of costs.

The Board now seeks summary judgment dismissing the plaintiff's claims.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2).  Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.

II.

*A.*
*Title VII Sex Discrimination*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...sex."  42 U.S.C. § 2000e-2(a)(1). When a hostile work environment is created through harassment, this antidiscrimination provision is likewise triggered.  See EEOC v. Boh Bros. Constr. Co., 731 F.3d 444, 452 (5th Cir. 2013)(citations omitted).   Furthermore, it is well-settled that Title VII's prohibition on employment discrimination based on sex includes a prohibition on same-sex sexual harassment. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)("If our precedents leave any doubt on the question, we hold today that nothing in Title VII necessarily bars a claim of discrimination 'because of ... sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex.").  An employee alleging same-sex harassment must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." See Oncale, 523 U.S. at 81.

Where, as here, a harassment claim arises out of a supervisor's conduct, the Fifth Circuit observes,

there are four elements of a hostile working environment

13

> claim: (1) that the employee belongs to a protected
> class; (2) that the employee was subject to unwelcome
> sexual harassment; (3) that the harassment was based on
> [a protected characteristic]; and (4) that the harassment
> affected a "term, condition, or privilege" of employment.
> <u>Lauderdale v. Tex. Dep't of Criminal Justice</u>, 512 F.3d
> 157, 162-63 (5th Cir. 2007).   To affect a term,
> condition, or privilege of employment, the harassing
> conduct "must be sufficiently severe or pervasive to
> alter the conditions of [the victim's] employment and
> create an abusive working environment." <u>Aryain v. Wal-</u>
> <u>Mart Stores of Tex., L.P.</u>, 534 F.3d 473, 479 (5th Cir.
> 2008)(alteration in original)....

<u>See</u> <u>Boh Bros. Constr. Co.</u>, 731 F.3d at 453.  "In the context of

same-sex discrimination," the Fifth Circuit instructs, "these

elements [are analyzed] by way of a two-step inquiry[:]

First,...whether the alleged conduct was sex discrimination and,

second,...whether the conduct meets the standard for a *quid pro quo*

or hostile-work-environment claim."  <u>Id.</u>

     With respect to the first inquiry, one way a plaintiff can

show that the alleged harassment was based on sex is to show "that

the alleged harasser made 'explicit or implicit proposals of sexual

activity' and provide 'credible evidence that the harasser was

homosexual.'"  <u>La Day v. Catalyst Tech., Inc.</u>, 302 F.3d 474, 478

(5th Cir. 2002)(quoting <u>Oncale</u>, 523 U.S. at 80, which "outlined

three ways in which a plaintiff can show that an incident of same-

sex harassment constituted sex discrimination").  If the plaintiff

submits adequate support that the alleged harassment was based on

sex, the plaintiff must show that the discriminatory conduct rose

to the level of either *quid pro quo* or hostile work environment

14

harassment. Id. at 481. Here, Simpson does not pursue a *quid pro quo* theory but, rather, submits that Wilson, his supervisor, created a hostile work environment.[5]

In pursuing a hostile work environment theory, a plaintiff must demonstrate that the alleged harassment was severe or pervasive. Id. at 482. "'[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Id. (quoting Butler v. Ysleta Indep. Sch. Dist., 161 F.3d 263, 269 (5th Cir. 1998)(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). To determine whether the plaintiff's environment was sufficiently hostile to trigger Title VII, the Court must examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher, 524 U.S. at 787 (explaining that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"). Of course Title VII "does not set forth 'a general civility code for the American workplace.'"

_____

[5]Simpson nowhere alleges, or attempts to prove, that a tangible employment action resulted from his refusal to submit to Wilson's sexual advances.

Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 61-62 (2006)(quoting Oncale, 523 U.S. 75, 80 (1998) and Faragher, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'")).

If a plaintiff proves that his harasser's conduct was severe or pervasive, the fact that the alleged harasser is the plaintiff's supervisor is significant.  The status of the harasser impacts whether or not the defendant may pursue an affirmative defense.  An employer is presumptively liable for proscribed harassment if the plaintiff was harassed by someone with supervisory authority over the plaintiff.  Ellerth, 524 U.S. at 761; Faragher, 524 U.S. at 806.  If the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment, then the employer is strictly liable and no affirmative defense is available.  Id.  Absent some tangible employment action, however, the employer may avoid liability by establishing "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Id.

*B.*
*Application*

1.   Discrimination Because of Sex?

One way a plaintiff may support his claim of same-sex harassment is to submit "credible evidence" that the harasser is homosexual and that the harassment was sexual in nature.   See Cherry v. Shaw Coastal, Inc., 668 F.3d 182, 188 (5th Cir. 2012)(citing Oncale, 523 U.S. at 81).   Two types of "credible evidence":

(1) evidence that the harasser "intended to have some kind of sexual contact with the plaintiff rather than to merely humiliate him for reasons unrelated to sexual interest", or

(2) evidence that the harasser "made same-sex sexual advances to others, especially other employees."

Id. (quoting La Day, 302 F.3d at 480).

Here, the plaintiff presents evidence in the form of his testimony that he was harassed by Wilson; some of plaintiff's submissions support a finding that the harassment was sexual in nature: Wilson's remarks that he "converted" men in college to homosexuality; Wilson's remarks inquiring whether Simpson's wife was "taking care of him" and his implicit proposal of sexual activity, that Wilson would "take care" of Simpson; Wilson touched Simpson's back "almost to" his "posterior" during the Christmas party photo; Wilson touched himself in a sexually suggestive and provocative manner (spreading his legs, rubbing his genitals, and licking his lips) when he and Simpson were alone in his office.

The Board does not contend that these allegations fail to support a finding that the harassment was sexual in nature. The Court notes that the SWB does not dispute that Wilson is homosexual, and the summary judgment record supports such a finding (when Simpson invited Wilson to his wedding and told him to "bring the missus", Wilson responded that he was in a relationship with a man). Accordingly, the record supports the conclusion that Wilson's conduct towards Simpson was sexual in nature.

2.   *Quid Pro Quo* or Hostile Work Environment Theory?

The defendant contends that Simpson has not alleged, and cannot show, that he suffered a tangible employment action at the hands of his alleged harasser and, therefore, (a) his claim should be analyzed under the hostile work environment theory and (b) the SWB is eligible for the Ellerth/Faragher defense. The Court agrees.

(a)

The plaintiff concedes that he pursues only a hostile work environment theory, and he otherwise fails to advance any argument concerning whether he was subjected to tangible employment action by Wilson.[6] It is undisputed that Simpson asked to be removed from

---

[6]That the plaintiff advances only a hostile work environment theory, and not a *quid pro quo* theory, compels a finding that the employer is eligible for the Ellerth/Faragher defense. Nevertheless, in Casiano v. AT&T Corp., the Fifth Circuit instructed that "[d]etermination whether the complaining employee has suffered a tangible employment action is the indispensable first step in every supervisor sexual harassment...case", and

Wilson's supervision.  As a result, the defendant submits (and the record supports) that Miller (not Wilson) decided to transfer Simpson to the finance department; notably, Wilson did not make or approve the decision to transfer Simpson to a different department, and the transfer did not result in any change in Simpson's pay or benefits.[7]  See Alaniz v. Zamora-Quezada, 591 F.3d 761, 772 (5th

_____

"reinforce[d] the methodology...for disposing of all supervisor sexual harassment claims" as follows:

> At the first stop on the Ellerth/Faragher road map, courts are required to determine whether the complaining employee has or has not suffered a "tangible employment action."  If he has, his suit is classified as a "quid pro quo" case; if he has not, his suit his classified as a "hostile environment" case. That determination provides a fork in the road on the Ellerth/Faragher map[:]  proof that a tangible employment action did result from the employee's acceptance or rejection of sexual harassment by his supervisor makes the employer vicariously liable[;] no affirmative defense will be heard....
> On the other hand, [in the hostile work environment context], a different inquiry ensues at the second stop: If proved, would the actions ascribed to the supervisor by the employee constitute severe or pervasive sexual harassment?  If they do not, Title VII imposes no vicarious liability on the employer; but if they do, the employer is vicariously liable-unless the employer can prove both prongs of the Ellerth/Faragher affirmative defense....

213 F.3d 278, 284 (5th Cir. 2000).

[7]"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.  "A tangible employment action in most cases inflicts direct economic harm."  Id.

Cir. 2009)(finding that the plaintiff's reassignment to HR manager
position did not constitute a tangible employment action, noting
that her duties remained unchanged, and she did not show that the
prior position was objectively superior so that her reassignment
could be considered a demotion).   Simpson does not dispute this
record.    Nor does he contend that he suffered any tangible
employment action because he rejected Wilson's sexual advances.
Even if the Court considered Simpson's suggestion -- that he was
frustrated with being transferred to the finance department in
particular -- as an attempt to characterize the reassignment as a
tangible employment action (a phrase not once mentioned in
Simpson's papers), the record provides no support.

                                (b)

     Although Simpson submits no proof that a tangible employment
action resulted from his acceptance or rejection of Wilson's sexual
advances, "[i]n certain circumstances, a constructive discharge can
be considered a tangible employment action that precludes an
employer from asserting the Ellerth/Faragher defense to vicarious
liability."   See Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 480
(5th Cir. 2008)(citing Ellerth, 524 U.S. at 765 and Penn. State
Police v. Suders, 542 U.S. 129, 140-41 (2004)).   An employer's
actions constitute a constructive discharge when "working
conditions become so intolerable that a reasonable person in the
employee's position would have felt compelled to resign."   Suders,

                                 20

542 U.S. at 141; <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 557 (5th Cir. 2007).  A plaintiff alleging that sexual harassment compelled him to resign must present "something more" than what is required to establish a hostile work environment claim.  <u>Suders</u>, 542 U.S. at 147.  The Fifth Circuit considers these factors in determining whether a reasonable employee would have felt compelled to resign: (1) demotion; (2) reduction in compensation; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on less favorable terms.  <u>Aryain</u>, 534 F.3d at 481 (citing <u>Hunt v. Rapides Healthcare Sys., LLC</u>, 277 F.3d 757, 771-72 (5th Cir. 2001).

Here, Simpson alleged in his complaint that he was constructively discharged.  However, the defendant counters that Simpson was not constructively discharged:  he was not demoted, his job responsibilities were not reduced, he was not assigned degrading work or assigned to a younger supervisor; he was not offered early retirement; and he was not threatened; nor are his allegations of harassment sufficient to establish such a claim.  He simply looked for and found another job.  Because the plaintiff in his opposition papers failed to counter the defendant's submission on the constructive discharge claim, the defendant insists that the

plaintiff abandoned the theory and it should be dismissed as such. The Court agrees.

Even if the Court considered the merits of the constructive discharge theory, however, Simpson has not submitted evidence that would allow a reasonable factfinder to find a constructive discharge occurred.  Simpson has not and cannot show that his working conditions were so intolerable that he had no choice but to quit.  Simpson submits nothing that would support a finding that Wilson's harassment was "calculated to encourage" his resignation; to the contrary, it is undisputed that when Simpson was reassigned as requested -- a step reasonably calculated to end the harassment -- the harassment indeed ceased.  Even considering circumstances unrelated to Wilson's harassment, for example, that Simpson was frustrated with being assigned to the financial department because he felt he lacked the requisite skill to complete the tasks assigned, the record is clear:  he had requested reassignment and had no complaints regarding how he was treated in the financial department (or the intergovernmental affairs department); and there is no suggestion that he was assigned degrading work.  Moreover, Simpson's displeasure with Miller's continued impatience with him and his displeasure with being reprimanded by Ms. St. Martin, which Simpson referenced in his resignation letter, likewise does not reasonably support a conclusion that Simpson had no choice but to quit.  In at least two cases, the Fifth Circuit held that conduct

arguably more impressive than in Simpson's case did not rise to the level necessary to establish a constructive discharge claim. <u>See Aryain</u>, 534 F.3d at 479-81 (daily comments and propositions, as well as less frequent but severe sexually charged and explicit comments); <u>see also</u> <u>Landgraf v. USI Film Products</u>, 968 F.2d 427, 430-31 (5th Cir. 1992)(finding that "substantial harassment" involving "continuous and repeated inappropriate verbal comments and physical contact," did not rise to the level necessary to establish a constructive discharge claim).

Accordingly, the plaintiff's constructive discharge claim must, on this record, be dismissed and the Board is eligible to pursue its affirmative defense; the Court proceeds to consider the hostile work environment theory that Simpson advances.

3.    Sufficiently Severe or Pervasive to Alter Conditions of Employment?

The parties dispute whether Wilson's harassment was severe or pervasive; a disjunctive test.    "[I]solated incidents, if egregious, can alter the terms and conditions of employment." <u>See Harvill v. Westward Communications, L.L.C.</u>, 433 F.3d 434-35 (5th Cir. 2005)(citing <u>Faragher</u>, 524 U.S. at 788).    Or, frequent incidents of harassment "can reach the level of 'pervasive'", likewise altering the terms and conditions of employment. <u>Faragher</u>, 524 U.S. at 788.

First, the defendant submits that, considering only the

conduct described in Simpson's February 4 memorandum, this conduct
is insufficiently severe or pervasive to constitute actionable
harassment.  Second, the defendant submits that, even considering
the plaintiff's new allegations of offensive conduct, which
plaintiff revealed for the first time after a lunch break during
plaintiff's deposition, Simpson's contradictory allegations do not
support his harassment claim.  In fact, the defendant urges the
Court not to consider the allegations made for the first time
during the second half of the plaintiff's deposition because the
late statements are analogous to a subsequent affidavit that may
not be used to contradict prior deposition testimony.[8]

The plaintiff counters that the harassing conduct was
frequent, severe, and physically humiliating.  He submits that he
endured more than 25 incidents of harassing conduct beginning in
June 2010 (before telling Wilson to "stop" shortly before Wilson
issued his memorandum of authority adjustment), including that
Wilson discussed his sexual exploits; he wore tight fitting pants
and rubbed his genitals while licking his lips and looking and
smiling flirtatiously at Simpson; he told Simpson that he could
satisfy Simpson if his wife couldn't; he told Simpson he loved him;

----

[8]The defendant also notes that, because Simpson testified
that he had repressed the memories of these later-revealed events,
none of these events could have affected him emotionally during his
employment and, therefore, could not have affected a term or
condition of employment.

he tried to touch Simpson's butt during a Christmas party photo.[9]

Viewing the record in the light most favorable to the plaintiff, the harassing conduct was frequent if not severe. Simpson clearly found Wilson's remarks and conduct to be subjectively offensive. The Court finds that it need not determine whether Wilson's conduct was sufficiently severe or pervasive to alter employment conditions because even assuming Simpson has raised a genuine dispute as to a material fact regarding severity or pervasiveness,[10] the defendant has proved its affirmative defense by a preponderance of the evidence, disposing of Simpson's hostile work environment claim, as a matter of law, to which the Court now turns.

4.   <u>Ellerth/Faragher</u> Affirmative Defense

---

[9]The Court need not reach the defendant's argument that the Court should disregard those incidents of harassment first revealed by the plaintiff during the second half of his deposition (after his lunch break).

[10]The Fifth Circuit "has held that a single incident in which a harasser briefly touched the plaintiff's anus, along with the statement that the harasser was jealous of the plaintiff's girlfriend, was sufficient to satisfy the severe or persuasive requirement." <u>See</u> <u>Cherry v. Shaw Coastal, Inc.</u>, 668 F.3d 182, 189 (5th Cir. 2012)(citing <u>La Day</u>, 302 F.3d at 483; and vacating the district court's order granting judgment as a matter of law in favor of the defendant, and remanding the case to the district court with directions to enter a judgment on the verdict with respect to the plaintiff's hostile work environment claim in which the record showed that the plaintiff's supervisor regularly commented on the plaintiff's looks, sent him sexually explicit text messages, invited him to stay at his house, implicitly propositioned him, and regularly touched the plaintiff's butt and massaged him).

The defendant submits that the undisputed facts clearly establish both prongs of the Ellerth/Faragher affirmative defense, the plaintiff fails to advance any contrary argument, and the plaintiff's sexual harassment claim should be dismissed.  The Court agrees.

(a)  The SWB Exercised Reasonable Care to Prevent and Promptly Correct Sexually Harassing Conduct

"An employer can satisfy the first prong of the Ellerth/Faragher defense by implementing suitable institutional policies and educational programs regarding sexual harassment." See EEOC v. Boh Bros. Constr. Co., 731 F.3d 444, 462 (5th Cir. 2013)(citations omitted).  The SWB submits that it exercised reasonable care to prevent promptly Wilson's sexually harassing behavior: it had in place an equal employment opportunity policy, a grievance complaint procedure, a specific workplace harassment policy (providing examples of prohibited conduct and outlining complaint procedures), and an EEO officer dedicated to promptly investigate complaints.  This policy is of record, and the plaintiff does not suggest that it was insufficient or insufficiently communicated; indeed, he eventually invoked the complaint procedure and the EEO officer investigated his complaint. Accordingly, the summary judgment evidence submitted by the defendant, which shows that it implemented procedures for facilitating sexual harassment complaints and thereafter responding

26

to them promptly with an investigation, is uncontroverted.  See id.
at 464 n.22 ("We have considered the existence of a written
complaint procedure to be an important variable in the
Ellerth/Faragher analysis."); see also Casiano v. AT&T Corp., 213
F.3d 278, 286 (5th Cir. 2000).

With respect to the "prompt, remedial action" element of a
typical hostile work environment claim,[11] the Fifth Circuit has
instructed:

> A defendant may avoid Title VII liability when harassment
> occurred but the defendant took "prompt remedial action"
> to protect the claimant.  Hockman v. Westward Commc'ns,
> LLC, 407 F.3d 317, 329 (5th Cir. 2004).  What constitutes
> prompt remedial action is a fact-specific inquiry....
> "An employer may be liable despite having taking remedial
> steps if the plaintiff can establish that the employer's
> response was not reasonably calculated to halt the
> harassment."  Id.

Williams-Boldware v. Denton County, Texas, --- F.3d ---, 2014 WL
349749, at *4 (5th Cir. Jan. 31, 2014).

Here, it is undisputed that, once Simpson reported the
harassment and requested reassignment away from his harasser, the
SWB called for an investigation by its EEO Officer (who conducted
interviews and reviewed documents) and, within seven days, Simpson
was reassigned so that he no longer reported to Wilson.  It is also
undisputed that the harassment stopped after Simpson's transfer to
the finance department.  The record supports a finding that the

---

[11]At the very least, an analogous inquiry to the first
prong of the Ellerth/Faragher affirmative defense.

defendant took prompt, remedial action that was reasonably
calculated to end, and did end, the harassment.  See id. at 5 ("in
determining whether the employer's actions were remedial, we have
considered whether the offending behavior in fact ceased")(citation
omitted).

    (b)  Simpson Unreasonably Failed to Take Advantage of
           Preventive or Corrective Opportunities Or to Avoid
           Harm Otherwise

Simpson failed for as many as 8 months to avail himself of the
SWB's anti-harassment policy and complaint procedures; he did not
report the harassment, which he alleges commenced in June 2010,
until February (after being reprimanded by Wilson for acting
outside his authority).  When he eventually did report the
harassment, the undisputed record evidence establishes that the SWB
responded promptly. It reassigned Simpson (as he requested).  Its
EEO officer investigated Simpson's complaints.  The harassment
stopped.

Simpson complained in his deposition that he was reluctant to
report the harassment for fear of retaliation.  But he ignores the
text of the complaint procedure, which provides for anonymous
complaints and nondisclosure. Moreover, the SWB could not remedy
harassment that it did not know was occurring.  Indeed, the Fifth
Circuit has "emphasize[d] that as employer's anti-harassment
policies become increasingly comprehensive and well-implemented, a

plaintiff's success will often turn on whether he promptly reported the harassing conduct." See Boh Bros. Constr. Co., 731 F.3d at 463 n.19 (noting that "the Ellerth/Faragher design 'works only if employees report harassment promptly, earlier instead of later, and the sooner the better"). Thus, 'where an employer implements suitable institutional policies and educational programs regarding sexual harassment, an employee who fails to take advantage of those policies cannot recover.'" Id. (citation omitted); Casiano, 213 F.3d at 287 (plaintiff's failure to report frequent sexual harassment by a supervisor over the course of several months was unreasonable). This is the only reasonable common sense result because a defendant "cannot be held liable for conduct of which it had no knowledge." Cf. Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 299 (5th Cir. 2001).

III.

*A.*
*Title VII Retaliation*

"Title VII's antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)(citation and internal quotation marks omitted). This anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated

29

in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a).[12]

Like employment discrimination claims, retaliation claims pursued by presentation of circumstantial evidence are governed by the McDonnell Douglas burden-shifting framework. McCoy v. City of Shreveport, 492 F.3d 551, 556-57 (5th Cir. 2007)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under that framework, an employee must first establish a prima facie case of retaliation by showing that: (1) he engaged in a protected activity; (2) that his employer took an adverse employment action;[13] and (3) that a causal link exists between the

---

[12]Section 704(a) provides in full:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

§ 2000e-3(a).

[13]To prove that an employer took an adverse employment action, the plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)(internal quotations omitted, citations omitted). "We speak of material adversity, the Supreme Court observes, because we believe it is important to separate significant from trivial harms." Id. (emphasis in original).

protected activity and the adverse employment action.  Id.

If the employee makes his *prima facie* case of retaliation, the burden shifts to the employer, which must articulate legitimate, non-discriminatory reasons for its employment action and then, if articulated, the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for its actual retaliatory purpose.  See id.  Traditional principles of but-for causation apply in the retaliation context:  the plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action...of the employer." See University of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013); see also Coleman v. Jason Pharmaceuticals, 540 Fed.Appx. 302, 304 (5th Cir. Sept. 17, 2013)(unpublished, per curiam)("An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action.").

### B.
### Application

The defendant contends that Simpson cannot satisfy his *prima facie* case because: (1) he had no objectively reasonable belief that the SWB engaged in employment practices barred by Title VII and, therefore, Simpson failed to engage in protected activity; (2) the plaintiff did not suffer an adverse employment action because a lateral transfer is not materially adverse as a matter of law; and (3) Simpson has not shown a causal connection between his

complaints and his allegedly adverse employment action.

The plaintiff's papers do little to shed light on what exactly he considers to be the SWB's retaliatory conduct. The Court assumes (generously) that Simpson characterizes the following as the alleged retaliatory conduct: (1) Wilson issued his January 31 memo of authority adjustment; (2) Miller transferred him to the finance department; (3) Miller gave him poor comments on his April 2011 evaluation; (4) Wilson withdrew his letter in support of plaintiff's promotion; (5) Miller was angry and yelled at Simpson after receiving Simpson's December 19, 2011 internal grievance alleging race discrimination against Miller; and (6) Simpson was escorted off the premises and issued a formal reprimand after he sent Miller a "final warning" email. None of these allegations constitute a materially adverse employment action.

First, Wilson's memo was authored before Simpson lodged his complaints regarding his sexually harassing conduct. And the memo was removed from Simpson's file once Simpson filed his internal grievances. Second, Simpson fails to submit persuasive evidence that his transfer to the finance department would have dissuaded a reasonable employee from lodging a complaint of discrimination; the record confirms that Simpson requested that he be reassigned, he was, and his pay, benefits, title, and working conditions remained unchanged. And the work he performed was within the broad description of his job classification. A lateral transfer is not

a materially adverse employment action.  Cf. Sabzevari v. Reliable Life Ins. Co., 264 Fed.Appx. 392, 296 (5th Cir. 2008)(unpublished, but persuasive).  Third, the record shows that Simpson's overall score on his evaluation was good; it "exceeds requirements"; there is no evidence that Simpson was adversely affected by this performance evaluation.  Fourth, Simpson admits that he was denied the promotion in question because he was not qualified.  Moreover, Miller told him he would not receive the promotion before Wilson sent his January 31 memo, which predates Simpson's complaints about Wilson.  Fifth, Simpson fails to suggest how Miller's anger at him for lodging a race discrimination grievance constitutes a material adverse employment action; nor does he attempt to link Miller's angry remarks or alleged tantrum to Simpson's alleged protected activity (complaining about Wilson).[14]   Finally, Simpson being escorted off the premises and formally reprimanded after sending what Miller perceived to be a threatening message, hardly rises to the level of a materially adverse employment action.

Nevertheless, even if one were to assume that Simpson has satisfied his *prima facie* case of retaliation, the SWB has carried its burden of production in articulating a legitimate non-retaliatory reason for reassigning the plaintiff to the finance department: the record confirms that Simpson asked to be separated

---

[14]Simpson does not pursue a race discrimination claim against Miller in this lawsuit.

33

from Wilson, and the SWB correctly submits that its legitimate business-related reason for transferring him to the finance department was so that he could become more familiar with the accounting side of the Board's fixed assets program, which was one of Simpson's responsibilities in support services.

Having articulated a legitimate, non-retaliatory reason for his reassignment, the burden shifts back to Simpson to show that the SWB's proffered reason is a pretext for its actual retaliatory purpose. Simpson makes no submission on this point and, therefore, fails to carry his burden.[15] He submits no evidence that the defendant's explanation is "false or unworthy of credence." Laxton v. Gap, Inc., 333 F.3d 572, 580 (5th Cir. 2003). There is no evidence showing that retaliation was the but-for cause of Simpson's transfer to the finance department.

Accordingly, the defendant's motion for summary judgment is GRANTED. The plaintiff's claims are hereby dismissed.


New Orleans, Louisiana, February 26, 2014


_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[15]Simpson speculates that he was moved to the finance department so that he would argue with Ethel Williams so that the Board would have evidence that he had a discipline problem. Subjective beliefs and speculation do not satisfy his burden to submit summary judgment evidence of pretext.

34